**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Hameed Abdulhussain, | No. CV-22-01458-PHX-SMB |
| Plaintiff, | **ORDER** |
| v. | |
| MV Public Transportation Incorporated, | |
| Defendant. | |

Pending before the Court are Plaintiff Hameed Abdulhussain's Motion for Summary Judgment (Doc. 81) and Defendant MV Public Transportation Incorporated's ("MV" or "Defendant") Motion for Summary Judgment (Doc. 84). The briefing is complete, and after consideration, the Court will **deny** Plaintiff's Motion and **grant** Defendant's Motion.

I. **BACKGROUND**[1]

A. **Plaintiff's Employment**

Plaintiff is a Middle Eastern man of Muslim faith who began working as a driver for Defendant on August 3, 2009. (Doc. 82 ¶ 1 (Plaintiff's Statement of Facts ("PSOF")).) Plaintiff submitted several complaints to MV management about another employee, Ednna Rodriguez. (*Id.* ¶ 2.) He claims Ms. Rodriguez discriminated and retaliated against him by filing false complaints, incorrectly adjusting his timecards, harassing him before and

---

[1] The parties provide a background for this case well beyond what is necessary to decide Plaintiff's claim. The Court will set forth only the facts that inform the claim and provide context for the parties' arguments.

after shifts, and purposefully assigning him difficult routes and passengers.  (*Id.*)  The issues between Plaintiff and Ms. Rodriguez became so intense that MV management advised Plaintiff to avoid conducting certain work responsibilities with her.  (*Id.* ¶ 3.)

On June 30, 2021, Plaintiff's coworker, Samantha Carillo, reported a conversation she had with Plaintiff in which he allegedly called MV management "corrupt and faggots and assholes and bitches" and Ms. Rodriguez "a 400-ton slut that needed to be hanged up as a slut ass bitch."  (Doc. 88-8 at 2; Doc. 88-9 ("Harper Decl.") ¶ 4.)  Ms. Carillo also claimed that Plaintiff referenced a mass shooting and said that he was angry enough to "go back in dispatch and kill [Ms. Rodriguez]" before remarking that he would rather "not kill but beat [her] enough to hurt her to be disabled."  (Doc. 88-8 at 2.)  On July 1, 2021, Defendant told Plaintiff that it was investigating him for an alleged company policy violation related to Ms. Carillo's report.  (PSOF ¶ 5.)  That same day, Defendant met with Plaintiff to place him on administrative leave pending the investigation.  (*Id.* ¶ 6.)  General Manager John Huynh, Operations Manager Kenneth Ming, and two Phoenix police officers attended the meeting.  (*See* Doc. 88-2 1–39 (Plaintiff Depo.); Plaintiff Depo. at 107–108.)  The Phoenix police officers recorded the meeting via body camera.  (*See* Doc. 88-10.)

In the meeting, Plaintiff remarked "[o]f course, I'm Muslim, terrorist, you have to be careful of that."  (Doc. 88-10 at 5.)  Plaintiff then compared himself to Samuel James Cassidy, a California mass shooter that killed nine of his colleagues.  (*Id.* at 6–7.)  Plaintiff remarked that Cassidy "never got 10% of the pressure I got from this company, from this employee" and that "human beings ha[ve] a limit of pressure."  (*Id.* at 7.)  Plaintiff also informed the police officers that he owned a firearm before referencing a different California mass shooting incident from 2013.  (*Id.*)  Then Plaintiff admitted he had spoken to Ms. Carillo about Ms. Rodriguez before telling the officers the following: "I said [to Ms. Rodriguez], 'You know what, let me tell you this.  I don't put my hands on women, but I put my hand on bitch.  But not in this company.  Not in here, unfortunately you're lucky.'"  (*Id.* at 8.)  Plaintiff then reiterated that Defendant and Ms. Rodriguez were lucky because employees who had received even less of the "oppression that [Plaintiff] got" would go

into their workplace and kill everyone. (*Id.* at 10–11.) At his deposition, Plaintiff also testified that "[o]ne day, [he] was going to jump in the window . . . and beat [Ms. Rodriguez] up and go to jail." (Plaintiff Depo. at 150–51.)

On July 2, 2021, MV Human Resources Director, Donna Harper, held a zoom meeting with Plaintiff, other MV employees, and several union representatives to discuss Plaintiff's disparaging comments towards management and threats to Ms. Rodriguez. (Plaintiff Depo. at 108–09.) On that call, Plaintiff denied making the comments about Ms. Rodriguez to Ms. Carillo. (*Id.* at 109–10.) Defendants subsequently interviewed four other employees. (Doc. 88 (Defendant's Additional Statement of Facts ("DASOF") at 18 ¶ 11.) No persons other than Plaintiff and Ms. Carillo had direct knowledge of the comments Plaintiff made during their conversation. (*Id.*) Ultimately, on July 22, 2021, Defendant terminated Plaintiff for violating the proscription against "[i]nappropriate verbal conduct directed towards coworkers" in his collective bargaining agreement. (Doc. 88-11 at 2.)

## B. The Alleged Defamatory Remarks

On September 11, 2021, Defendant's employee, JoAnn Paige, told Ms. Rodriguez that she saw someone that looked like Plaintiff driving down the block from Defendant's property. (Doc. 88-4 at 1–31 (Paige Depo.); Paige Depo. at 27–30, 32.) Ms. Rodriguez then told Jeffrey Lampton, one of Defendant's management employees, that Ms. Paige saw Plaintiff parked down the street. (Doc. 88-5 at 1–11 (Rodriguez Depo.); Rodriguez Depo at 29–31.) Mr. Lampton then conferred with Ms. Paige about the situation. (Paige Depo. at 43.) Mr. Lampton never saw Plaintiff on the premises. (Doc. 88-1 at 1–20 (Lampton Depo.); Lampton Depo. at 31.) After learning about Plaintiff's potential presence, Mr. Lampton texted Mr. Huynh that "Hameed showed up here today in the north parking lot." (Doc. 88-12 at 2.) After consulting with Mr. Huynh, Mr. Lampton locked down MV's property. (Lampton Depo. at 9, 44–45.) Mr. Lampton then sent a series of text messages (the "Company Texts") to roughly 35 of Defendant's drivers, one of which stated that an "EX-EMPLOYEE WAS SEEN ON THE PROPERTY TODAY. DUE TO THIS EVENT, THE BUILDING WILL BE LOCKED DOWN." (PSOF at 29; Lampton Depo. at 44–45.)

According to Plaintiff, the Company Texts, among other statements allegedly made on September 11, 2021, were defamatory. The statements include: (1) a rumor told to Plaintiff by Ali Alkazaly and Tanya Thomas that Ms. Rodriguez and Ms. Carillo said that Ms. Rodriguez believed Plaintiff was coming to kill her, (*see* Plaintiff Depo. at 166–67); (2) statements by Mr. Alkazaly and Tiffany Hawkins to Plaintiff telling him that they heard from Ms. Paige that he was sitting in his Toyota RAV4 on Defendant's property, (*id.* at 178); and (3) the Company Texts that Mr. Lampton sent to the drivers, (*id.* at 202–206).

## II.    LEGAL STANDARD

Summary judgment is appropriate in circumstances where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of a case under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Factual disputes are genuine when the evidence could allow a reasonable jury to find in favor of the nonmoving party. *Id.* "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record" or by "showing that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)–(B). Additionally, the Court may enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

When considering a motion for summary judgment, a court must view the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must draw all reasonable inferences in the nonmovant's favor. *Anderson*, 477 U.S. at 255. Additionally, the Court does not make credibility determinations or weigh the evidence. *Id.* at 253. The determination of whether a given factual dispute requires submission to a jury is guided by the substantive evidentiary standards that apply to the case. *Id.* at 255.

The burden initially falls with the movant to demonstrate the basis for a motion for

summary judgment, and "identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323. If this initial burden is not met, the nonmovant does not need to produce anything even if they would have the ultimate burden of persuasion at trial. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). However, if the initial burden is met by the movant, then the nonmovant has a burden to establish that there is a genuine issue of material fact. *Id.* at 1103. The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Zenith Radio Corp.*, 475 U.S. at 586. Bare assertions alone do not create a material issue of fact, and "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 247–50 (citations omitted).

"[W]hen parties submit cross-motions for summary judgment, [e]ach motion must be considered on its own merits," but the Court must consider all evidence submitted in support of both cross-motions when separately reviewing the merits of each motion. *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (quotation marks omitted). For "the party with the burden of persuasion at trial"—usually the plaintiff—to succeed in obtaining summary judgment in its favor, it "must establish beyond controversy every essential element" of each claim on which summary judgment is sought. *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003). The party without the burden of persuasion at trial—usually the defendant—is entitled to summary judgment where it establishes that the party with the burden of persuasion will be unable to prove at least one element of its claim in light of the undisputed facts. *Celotex Corp.*, 477 U.S. at 322–23. This distinction reflects that the burden is ultimately on the proponent of each claim to prove it. *Id.* ("Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof

1    concerning an essential element of the nonmoving party's case necessarily renders all other

2    facts immaterial.").

3    **III.    DISCUSSION**

4         Before reaching the merits of the parties' Motions, a few preliminaries are in order.

5    Given that a single claim remains at summary judgment, the factual and legal matter

6    presented in the parties' respective Motions are nearly identical.  Consequently, the Court's

7    analyses of the issues presented in each Motion are roughly the same.  That being the case,

8    the Court groups the parties' arguments together by issue and provides a single analysis.

9    *See Longoria v. Kodiak Concepts LLC*, 527 F. Supp. 3d 1085, 1095 (D. Ariz. 2021) (setting

10   forth the parties' arguments and analyzing cross-motions for summary judgment together).

11        The next issue concerns Plaintiff's attempt to expand the scope of his claim on

12   summary judgment.  In his Amended Complaint, Plaintiff alleged that on September 11,

13   2021, Defendant "published statements to numerous employees stating that Plaintiff

14   showed up at the workplace . . . for unlawful reasons, intentionally invoking fear" given

15   "Plaintiff's national origin on a day that is remembered for attacks on the United States by

16   Middle Eastern, Muslim men."  (Doc. 24 at 5 ¶ 24; *see id.* ¶¶ 12, 28 (alleging that the

17   publication of the statements painted Plaintiff as a terrorist.)  In response to Defendant's

18   interrogatories, Plaintiff answered that the date of the statement "that forms the basis of

19   Plaintiff's defamation claim" was September 11, 2021, (Doc. 88-3 at 10.)   And when

20   deposed, Plaintiff testified that, other than the Company Texts, "the rumor that [he] was

21   supposed to be coming to kill [Ms. Rodriguez,] and [that he] was sitting in [his] vehicle on

22   the property and the text messages to the drivers," he could not recall any other defamatory

23   remarks.  (*See* Plaintiff Depo. at 166; *see also id.* at 191–92 (Plaintiff testifying that no

24   person employed at Defendant's company ever called him a terrorist either in speech or

25   writing.)   At Plaintiff's deposition, he also agreed that he never sought to amend his

26   pleading to include claims encompassing Ms. Rodriguez or Ms. Paige's statements.

27   (Plaintiff Depo. at 187–88.)   Though, Defendant did depose Plaintiff regarding the two

28   instances of conduct not alleged in the Complaint.  (*See, e.g.*, *id.* at 166, 178.)   Plaintiff

1    never announced or disclosed that his defamation claim exceeded these three alleged

2    statements.

3    In his Motion and Response to Defendant's Motion, however, Plaintiff attempts to

4    expand his claim to include statements alleged to be made after September 11.  (*See, e.g.*,

5    Doc. 81 at 9; Doc. 89 at 8–9.)  The record makes clear that Plaintiff litigated this case

6    through discovery and up to summary judgment based on the alleged defamatory

7    statements made on September 11, not after.  Therefore, the Court will not allow Plaintiff

8    to conjure up new theories of liability at summary judgment.  To do so without allowing

9    Defendant an opportunity to investigate those claims more thoroughly would be

10   prejudicial.  *See Lockheed Martin Corp. v. Network Sols., Inc.*, 194 F.3d 980, 986 (9th Cir.

11   1999) ("A need to reopen discovery and therefore delay the proceedings supports a district

12   court's finding of prejudice from a delayed motion to amend the complaint.").[2]

13   The final preliminary issue touches on the actionability of the three alleged

14   _____

[2] Generally, when a plaintiff raises new claims or theories outside of the pleadings at summary judgment, the district court should treat it as a request to amend the pleadings under Federal Rule of Civil Procedure 15(b).  *See Apache Survival Coalition v. United States*, 21 F.3d 895, 910 (9th Cir. 1994); *See Seaboard Surety Co. v. Grupo Mexico, S.A. de C.V.*, 2008 WL 11339626, at *7 (D. Ariz. Sept. 30, 2008); *see also Wolf v. Univ. Pro. & Tech. Emps., Commc'ns Workers of Am. Loc. 9119*, No. C 19-02881 WHA, 2020 WL 6342934, at *4 (N.D. Cal. Oct. 29, 2020).  Treating it as such, Plaintiff's requested amendment would be filed some two-years after the deadline to amend the pleadings in this case and approximately eighteen months after the Amended Complaint.  (*See* Doc. 17 (case management order; Doc. 24 (Amended Complaint).)  This means that Plaintiff's requested amendments are also subject to Federal Rule of Civil Procedure 16.  *Donges v. USAA Fed. Savings Bank*, No. CV-18-00093-TUC-RM, 2019 WL 1557533, at *1–2 (D. Ariz. April 10, 2019) (applying Rule 16 before Rule 15 when the plaintiff filed a motion to amend its complaint after briefing on summary judgment was complete).  Under Rule 16(b)(4), a scheduling order "may be modified only for good cause and with the judge's consent." The primary focus of the "good cause" inquiry is the diligence of the moving party. *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992). "Moreover, a district court may deny as untimely an amendment motion filed after the scheduling order's cut-off date where no request to modify the order has been made." *Capuano v. Kenneth Eisen & Assocs., Ltd.*, No. CV-11-02395-PHX-JAT, 2012 WL 2376675, at *1 (D. Ariz. June 22, 2012) (citing *Johnson*, 975 F.2d at 608–09).  Plaintiff cannot show good cause, as no attempt was made to amend the operative pleadings to include Plaintiff's new claims or theories.  And while Plaintiff contends that, as a "notice pleading," the Complaint put forth sufficient factual allegations to notice Defendant of potential additional claims.  (Doc. 89 at 7.)  Not so.  The Complaint specifically targets September 11, 2021 as the date of the defamatory remarks upon which this entire matter centers.  Plaintiff cannot now assert new theories of liability as a late-stage "gotcha!" moment to survive summary judgment.  At bottom, the case will proceed without allowing Plaintiff to slip in additional instances of defamation on summary judgment.

defamatory statements.  Put simply, there is no evidence that Defendant uttered the rumor that Plaintiff was at Defendant's property to kill Ms. Rodriguez or that Plaintiff was sitting in his RAV4 near Defendant's property.  (*See* Plaintiff Depo. at 166–67, 178.)  Even Plaintiff admits that it was Mr. Alkazaly and Ms. Thomas who told him that they heard Ms. Rodriguez say Plaintiff intended to kill her.  (*Id.*)  And Mr. Alkazaly and Ms. Hawkins told Plaintiff they heard Ms. Paige say he was present in his vehicle.  (*Id.*)  Evidentiary concerns aside, Defendant did not make either of these statements, nor has Plaintiff presented evidence aside from bald assertions in his moving papers that Defendant authorized or ratified Ms. Rodriguez or Ms. Paige's decision to make these statements.  *See Green Acres Trust v. London* ("*London I*"), 688 P.2d 658, 665 (Ariz. Ct. App. 1983) ("A 'blanket allegation' that the client authorized or ratified" a defamatory statement made by his attorney "is insufficient to support a claim for client liability"), *reversed on other grounds by Green Acres Trust v. London* ("*London II*"), 688 P.2d 617 (Ariz. 1984).  Thus, the Court is left with determining whether either party is entitled to summary judgment on Plaintiff's defamation claim based on the Company Texts.

### A. Defamation

As is evident at this point, Plaintiff's sole remaining claim is for defamation. Plaintiff argues that he has proved beyond dispute each of the required elements of his claim, and that Defendant does not possess any privilege shielding it from liability.  (*See* Doc. 81 at 8–13; Doc. 89 at 9–18; Doc. 92 at 8–9.)  Plaintiff also maintains that he has presented sufficient evidence of "evil mind" to support awarding punitive damages.  (Doc. 89 at 17.)  In turn, Defendant argues that no dispute of material fact exists because (1) it holds and did not abuse a qualified privilege to have sent the Company Texts; and (2) it shows beyond dispute that Plaintiff fails to establish a prima facie case of defamation.  (*See* Doc. 84 at 1–2, 7–15.)

The Court will first discuss whether a qualified privilege immunizes Defendant's conduct before discussing the sufficiency of Plaintiff's prima facie case.

1. <u>Qualified Privilege</u>

A qualified (or conditional) privilege is a complete defense to defamation based on the "social utility of protecting statements required to be made in response to a legal, moral or social duty." *London II*, 688 P.2d at 625. A qualified privilege differs from an absolute privilege in that "the interest which the defendant is seeking to vindicate is regarded as having an intermediate degree of importance, so that the immunity conferred is not absolute, but is conditioned upon publication in a reasonable manner and for a proper purpose." *Id.* (citing Prosser, *Law of Torts* § 115, at 785–86 (4th ed. 1971)). Arizona employs a two-part test to determine whether a qualified privilege exists: (1) Did a privileged occasion arise?; (2) If so, was the occasion for the privilege abused? *Id.* Whether an occasion arose is a question of law for the court, while whether abuse occurred is generally a fact question for the jury. *Id.* (citing *Roscoe v. Schoolitz*, 464 P.2d 333, 336–37 (Ariz. 1970)).

A court may find a privileged occasion arose when a defamation defendant establishes "that the circumstances in which the communication was made created an obligation to speak." *Id.* Two potential privileged occasions are at issue here. First, the "Protection of the Publisher's Interest," which arises if the publication of a statement serves the lawful protection of the publisher's interest. Restatement (Second) of Torts ("Restatement") § 594 (1977); *id.* cmt. d; *Burns v. Davis*, 993 P.2d 1119, 1126 (Ariz. Ct. App.1999) ("Arizona views the Restatement as authority for resolving questions concerning rules in defamation cases."). A publisher's interest may include "the interest of the proprietor of a business" in protecting against unlawful acts or reasonable invasions of the interests of others. Restatement § 594 cmt. d.

Second, the "Protection of Interest of Recipient or a Third Person." *Id.* § 595. This occasion arises when a statement is "published by someone under a legal duty or social obligation to protect others," *London II*, 688 P.2d at 625, such as when a publisher communicates to police officers about potential criminal acts against a third person, or by publishers making statements to strangers or the person who is imperiled, "since there is a social justification for reasonable efforts to protect anyone, friend or stranger, against

violence." Restatement § 595 cmt. g. The Arizona Supreme Court remarked that "[t]he broadness of this formula is due to the 'infinite variety' of fact situations which are traditionally collected under this heading. The privilege applies to contexts like summoning a police officer, describing a former employee to a prospective employer, or protecting a family member." *London II*, 688 P.2d at 625 (internal citation omitted); *see also* Restatement § 595 cmt. d ("[I]t is unnecessary that the interest in question be actually in need of protection. It is enough that the circumstances are such as to lead to the reasonable belief that the third person's interest is in danger. If the publisher does not believe in the necessity of the publication for the protection of the interest, the privilege is abused.").

### a. *Whether a Privileged Occasion Arose*

Defendant argues the circumstances of Plaintiff's threats, termination, and potential presence on MV property gave rise to a privileged occasion that protects Mr. Lampton's statements in the Company Texts. (Doc. 84 at 7; Doc. 87 at 7–8.) Plaintiff's position on this matter is rather confusing. He both recognizes that whether a privileged occasion arose is a question for this Court, (Doc. 89 at 13), but goes on to argue about his NLRB case and other issues, before concluding that this question ought to reach the jury, (*id.* at 13–15; *see also* Doc. 92 at 5, 8–9.)

Before discussing the facts supporting Defendant's claimed privileges, the Court aims to dispel potential confusion about the applicable law. As noted, Plaintiff recognized that whether a privileged occasion arose is a legal question for the Court, but asked that this determination go to the jury. The Court imagines this confusion may have resulted from Plaintiff's citation *Roscoe*, 464 P.2d at 336. There, the Arizona Supreme Court explained that "whether the occasion is privileged or not is to be rule on by the court as a matter of law, *except in those cases where the facts of the occasion are in dispute*." *Id.* (emphasis added). Fourteen years later in *London II*, the Arizona Supreme Court cited *Roscoe* for the proposition that determining whether a privileged occasion arose is a question of law for the court. *London II*, 688 P.2d at 624. The Arizona high court,

however, did not comment on whether it intended to sever the latter part of the *Roscoe* rule that could place the privileged occasion determination into the hands of the jury.  *See id.* Nor does *London II* otherwise implicitly overrule the rule as stated in *Roscoe*.  *See id.*  But even if the *Roscoe* rule applies as written, as explained below, there is no legitimate dispute of facts surrounding the occasion.  The question, therefore, remains a question of a law for this Court to determine at summary judgment.  *London II*, 688 P.2d at 624.

Plaintiff attempts to dispute the facts giving rise to the privileged occasion by denying making any threats, pointing out that the NLRB filed a complaint alleging that Defendant retaliated against Plaintiff, and noting that Defendant knew about the issues between Plaintiff and Ms. Rodriguez.  (Doc. 89 at 13; Doc. 92 at 7–8.)  First, it is incredible to deny making threats when police body camera footage transcripts and one's own deposition testimony evidence that Plaintiff made threats.  (*Compare* Doc. 89 at 13 ("The claim that Plaintiff made threats is wholly denied."), *and id.* at 14 ("There is simply no established basis that Plaintiff posed a threat to [Defendant's] employees' safety."), *with* Plaintiff Depo. at 150–51 ("Q: In the video you said you would jump in the window . . . beat [Ms. Rodriguez] up, and then go to jail? A: Yes."), *and* Doc. 88-10 at 8 ("I said [to Ms. Rodriguez], 'You know what, let me tell you this.  I don't put my hand on women, but I put my hand on bitch.  But not in this company.  Not in here, unfortunately you're lucky.'").)  Even if Plaintiff's blanket denial of threatening Ms. Rodriguez only concerned the largely unknown comments he made to Ms. Carillo, those are irrelevant considering the record shows that Plaintiff admitted to making *actual* threats. (*See* Doc. 88-10; Plaintiff Depo. at 150–51.)  Second, the NLRB scheduled a hearing and requested Defendant to file an answering brief to Plaintiff's complaint.  It is not clear how that action is relevant to determine whether a privileged occasion arose for Mr. Lampton to warn his staff that known-to-be-threatening former employee might be lurking nearby.  (*See* Doc. 88-10 at 7 (Plaintiff comparing himself to that of a California mass killer and stating that "[t]his guy never got 10% of the pressure I got from this company").  Third, Mr. Lampton's knowledge about Plaintiff and Ms. Rodriguez's tumultuous work relationship is irrelevant based on

his knowledge about the threats and given that Ms. Paige made the report causing the Company Texts.  (*See* Lampton Depo. at 10.)

Defendant's claim to privilege is supported by numerous facts.  First, Mr. Lampton knew Plaintiff had allegedly threatened to harm Ms. Rodgriguez.  (*Id.*)  Further, Ms. Paige testified that she reported seeing someone resembling Plaintiff driving a car like Plaintiff's near Defendant's property.  (Paige Depo. at 33–34.)  Ms. Paige stated that she made the report to Ms. Rodriguez "for her safety and everybody else's safety" given what she knew about Plaintiff's prior threats towards Ms. Rodriguez.  (*Id.* at 32.)  Based on the record, Ms. Paige's knowledge likely centered around Plaintiff's statements that Ms. Rodriguez "is lucky that she hit on [Plaintiff], not somebody else, because nobody would control themselves" the way Plaintiff did, as well as Plaintiff's statement to two managers and Phoenix police comparing himself to mass murderers.  (*See* Plaintiff Depo. at 150–51; Doc. 88-10 at 6–9.)  Mr. Lampton therefore testified that he sent the Company Texts and locked down the site because of "[t]he safety of [the employees] on site was paramount to me; therefore I did what I did out of an abundance of caution based on the allegations that I heard and the fact—and the fact that this was an employee who was not allowed to be on the site."  (*Id.* at 16.)

The facts outlined above lead the Court to find that a privileged occasion arose under both the Restatement §§ 594 and 595.  This finding rests on many of the same instances of conduct that Defendant highlights.  For example, when sending the Company Texts, Defendant had both an interest to protect itself, i.e., ensuring safety of its business and employees from potential physical harm, and a social justification to ensure the same.  Mr. Lampton knew about Plaintiff's alleged violent threats, and thus, acted reasonably to inform other employees about Plaintiff's potential presence near company property. Restatement § 595 cmt. g ("It is enough that the circumstances are such as to lead to the reasonable belief that the [publisher's] or third person's interest is in danger." (citing § 594 cmt. h)); (Lampton Depo. at 10.)  This is true on these facts even if Plaintiff was never actually on or near the property.  *See* Restatement § 595; *Miller v. Servicemaster by Rees*,

851 P.2d 143, 145 (Ariz. Ct. App. 1992) ("In this case a conditional privilege exists because public policy dictates that employees must be protected from workplace sexual harassment . . . . Accordingly, Ms. Powers' report and Servicemaster's transmittal of that report to appellant's employer were for the benefit of protecting her from unwanted harassment, *real or perceived*, and are conditionally protected." (Emphasis added)). The next inquiry, therefore, is whether Defendant abused the privilege.

### b. Whether Defendant Abused the Privilege

Plaintiff must now show that Defendant abused the privilege "by proving publication with 'actual malice' or by demonstrating excessive publication." *London II*, 688 P.2d at 624. "Actual malice" occurs when the defendant "makes a statement knowing its falsity or actually entertaining doubts about its truth." *Id.*; *see also Selby v. Savard*, 655 P.2d 342, 345 (Ariz. 1982) (stating that, for defamation, "actual malice" requires "clear and convincing evidence" that the defendant published the false statements). While normally a jury question, the Court may "dispose of the issue" when there is no evidence of malice. *Aspell v. Am. Contract Bridge League of Memphis, Tenn.*, 595 P.2d 191, 193 (Ariz. Ct. App. 1979).

Plaintiff argues that Defendant acted with actual malice, although the arguments are difficult to follow. (Doc. 89 at 15–16; Doc. 92 at 9.) At best, the Court understands Plaintiff arguments to be as follows: (1) Because the NLRB "charged Defendant" for relating against Plaintiff, Defendant acted with "ill will" in sending the text message; (2) Defendant prolonged the false publication even after Ms. Paige expressed to Defendant that they were overreacting; (3) Ms. Rodriguez and Mr. Lampton communicated before Mr. Lampton published the texts, evidencing ill intent; (4) Defendant made false statements to Mr. Huyn and the company drivers, "calling Plaintiff a terrorist," (5) Defendant has "changed [its] stories"; and (6) Defendant's employees provided inconsistent stories about Plaintiff's complaints of harassment and discrimination against Ms. Rodriguez. (Doc. 89 at 15–16; Doc. 92 at 9–10)

The evidence of Plaintiff's threats towards Ms. Rodriguez dispels many of his

arguments.  Taking them in turn, Plaintiff offers no evidence to connect the NLRB action and Mr. Lampton's decision to send the Company Texts and lock down the facility.  (*See* Lampton Depo. at 16 (testifying that sent the Company Texts to protect his employees from potential harm).)  Second, simply stating that the texts were available after September 11 does not show perpetuation or malice—i.e., that Defendant knew of its falsity or entertained doubts about its truth—considering Plaintiff's known threats. (*See id.* at 45 ("Q: And when you send a message out to the buses, do you know how long those messages stay in the system? A: Just until the bus comes in, parks and the system shuts down."); *but see* Doc. 90 at 113 ("Q: When did you see this? . . . A: 9/11, maybe 9/12, 13, 14, 15.").)

Third, whether Ms. Rodriguez and Mr. Lampton communicated before sending the texts fails to evidence knowing falsity or serious doubts because Ms. Paige reported seeing a person that resembled Plaintiff in a vehicle like Plaintiff's on the property, not Ms. Rodriguez.  (*See* Paige Depo. at 34, 40; Lampton Depo. at 13, 30, 32; *see also* Plaintiff Depo. at 209–10 (testifying that he has no reason to believe that Mr. Lampton doubted Ms. Pagie's statements about Plaintiff's presence).)  Additionally, Ms. Rodriguez testified that she did now know about the texts until after September 11.  (Rodriguez Depo. at 35.) Plaintiff is attempting to construct a narrative that Mr. Lampton and Ms. Rodriguez conspired to defame Plaintiff because of Ms. Rodriguez's "ill-will" towards him.  Even assuming that the statement in the Company Message was defamatory, actual malice is still not established simply through "a showing of bad motives or personal ill-will."  *Heuisler v. Phoenix Newspapers, Inc.*, 812 P.2d 1096, 1100 (Ariz. Ct. App. 1991); *see also New York Times v. Sullivan*, 376 U.S. 254, 279–86 (1964) (requiring clear and convincing evidence of either knowledge of falsity or reckless disregard for the truth or falsity of a statement).

Fourth, Plaintiff's remaining claim does not encompass alleged remarks about Plaintiff occurring after September 11.  (Paige Depo. at 58–59 (testifying that Mr. Lampton did not call Plaintiff a terrorist on September 11); Lampton Depo. at 22 (Mr. Lampton denying doing so); Plaintiff Depo. at 204–05 (stating that nobody ever called him a

terrorist).)    Fifth, it is not abundantly clear what Plaintiff means when he argues that Defendant "changed stories." (Doc. 89 at 16.)  It may be that Plaintiff intends to argue that because Ms. Paige claims she reported only that someone who "looked like Plaintiff" was "nearby," while the Company Texts stated an "EX-EMPLOYEE WAS SEEN ON THE PROPERTY TODAY," that Defendant knew the message was false. (*See* Doc. 91 at 7–8.) Even assuming this to be Plaintiff's position, there is no evidence that Defendant knew the falsity of the message, nor has Plaintiff offered authority to support finding immaterial inconsistencies are enough to show actual malice.  Sixth, Plaintiff's complaints against Defendant and Ms. Rodriguez bear no relation to whether Mr. Lampton, based on the circumstances, sent the texts with knowledge of their falsity based on some ill-will towards Plaintiff for lodging complaints against MV's staff.  *Cf. Heuisler*, 812 P.2d at 1100.

Taken as a whole, the record establishes that Mr. Lampton sent the texts to protect MV and its employees.  The assertion that Mr. Lampton sent the message for any other reason, or with knowledge of its falsity or reckless disregard for its falsity, is unsupported by the record.  In other words, Plaintiff has failed to adduce any evidence that Defendant acted with actual malice in sending the Company Texts.  *Id.* at 1100 ("The evidence must be sufficient to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." (citation altered)); *see also id.* (finding sloppy reporting about a candidate for state office's prior conviction and court martial was not evidence of actual malice).  No reasonable jury could interpret the Company Texts as clear and convincing evidence that Defendant entertained serious doubts about the truth of the statement therein. *See id.*

Because the Court finds that Defendant possesses a qualified privilege, Plaintiff's claim must fail.  *See London II*, 688 P.2d at 624.  Even so, the Court will discuss why Plaintiff also fails to establish a prima facie case of defamation.

## 2. Prima Facie Case

"The tort of defamation requires a false and defamatory statement concerning the plaintiff, an unprivileged publication of the statement to a third party, fault on the part of

1    the publisher, and either presumed or actual damages." *Best Western Int'l, Inc. v. Furber*,

2    CV-06-1537-PHX-DGC, 2008 WL 4182827, at *4 (D. Ariz. Sept. 5, 2008).[3]

3                    *a.   False and Defamatory*

4            To be defamatory "a publication must be false and must bring the defamed person

5    into disrepute, contempt, or ridicule, or must impeach plaintiff's honesty, integrity, virtue,

6    or reputation." *Turner v. Devlin*, 848 P.2d 286, 288–89 (Ariz. 1993) (citation omitted).  A

7    statement may also be actionable if it "implies a clearly defamatory meaning." *Rogers v.*

8    *Mroz*, 502 P.3d 986, 990, 994 (Ariz. 2022) (holding that a true statement may yet still be

9    defamatory if its "secondary meaning is false").

10           Plaintiff argues the claim that he was on Defendant's property is demonstrably false

11   and has a defamatory meaning because it implies that he is a terrorist.  (*See* Doc. 81 at 9,

12   11; Doc. 89 at 11.)  In response, Defendant argues that Plaintiff fails to conclusively prove

13   the falsity of the Company Texts related to his potential presence near the company site.

14   (Doc. 84 at 11; Doc. 87 at 12–13.)  Additionally, Defendant argues that the statement is

15   not expressly nor impliedly defamatory because it does not name Plaintiff nor does it imply

16   that, because of his ethnicity or religion, he is a terrorist.  (Doc. 84 at 11; Doc. 87 at 12–

17   13.)

18           Regarding falsity, Plaintiff has not extinguished the possibility that he was present

19   near or on Defendant's property on September 11, 2021.  The record evidence to this point

20   is quite weak, albeit disputed.  On Defendant's side, it relies on Ms. Paige's statement to

21   Mr. Lampton that she saw someone who looked like Plaintiff in his same color RAV4 on

22   that day.  (Paige Depo. at 27–30, 32.)  On Plaintiff's side, he avers that he was "at another

23   job transporting passengers" on September 11 and that day he was "never on or even near

24   the Defendant's premises."  (Doc. 82 at 10–13 (Plaintiff Decl.); Plaintiff Decl. ¶¶ 12–13;

25   *but see FTC v. Publishing Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997) ("A

26   conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is

27   insufficient to create a genuine issue of material fact."); *Kennedy v. Applause, Inc.*, 90 F.3d

28   _____

[3] The parties do not challenge whether the Company Texts were published to a third party, leaving only (a) false and defamatory; (b) fault; and (c) damages or harm on the table.

1477, 1481 (9th Cir. 1996).  Plaintiff also supplied a letter from his new employer, Transdev Services, Inc., that reads: "This letter is to certify that [Plaintiff] . . . reported to work at 5:25 am [on September 11].  He was performing his job duties until 4:04 pm." (Doc. 82 at 68.)  Although the letter shows that Plaintiff was on shift that day, it does not prove beyond dispute that he was driving something other than his RAV4, or that he was not driving near Defendant's property.  Whether Plaintiff was on MV's property remains a material dispute of fact.  Thus, summary judgment is denied to the extent that Plaintiff seeks it his favor based purely on the falsity of his potential presence on Defendant's property.

Plaintiff similarly fails to clear a much more daunting hurdle.  Even if false, the message does not convey any express or implied defamatory meaning.  *See Dube v. Likins*, 167 P.3d 93, 107 (Ariz. Ct. App. 2007) (finding that a letter naming the plaintiff and characterizing his allegations against a university professor as "unconfirmed" was not defamatory but merely suggested that "the veracity of [the plaintiff's] allegations was not yet determined); *see also* Restatement § 614 cmt. b ("[T]he court determines whether the communication is capable of bearing the meaning ascribed to it by the plaintiff and whether the meaning so ascribed and carried is capable of being defamatory. If the court decides against the plaintiff upon either of these questions, there is no further question for the jury to determine and the case is ended.").  The Company Texts do not name Plaintiff nor contain generally cognized defamatory remarks.  *Cf. Yetman*, 811 P.2d at 329–30 (explaining that calling a political opponent a "communist" may impart defamatory meaning).  And even if the employees who received the Company Texts knew it referred to Plaintiff, there is zero evidence that it implied him to be an Arab, Muslim terrorist coming to harm Defendant's employees on September 11.  Nor does it reasonably imply, as Plaintiff believes it to do, that he is "Satan."  (Plaintiff Depo. at 204.)  Consequently, no reasonable jury could find that the Company Texts, combined with Plaintiff's ethnicity and religion, painted him as a terrorist or otherwise brought him into disrepute.  *See Rogers*, 502 P.3d at 994 ("That the statement is challenged not on its express terms, but by its

1  asserted implication, makes it doubly attenuated . . . . It is inherently difficult to prove the

2  falsity of an implication . . . because an implication necessarily lies in the eyes of the reader

3  or the ears of the listener.").

4      At bottom, the Company Texts, even if false, are not expressly nor impliedly

5  defamatory.  Failing to show that a statement is defamatory is fatal to Plaintiff's claim, and

6  thus summary judgment in favor of Defendant is proper.  *Celotex Corp.*, 477 U.S. at 322.

7                        *b.  Fault*

8      Given the First Amendment's protection of free speech, fault is an essential element

9  of a claim for defamation. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 347 (1974);

10  *Boswell v. Phoenix Newspapers, Inc.*, 730 P.2d 178, 180 & n.1 (Ariz. App. Div. 1985);

11  Restatement § 580B cmt. c.  Fault may consist of actual malice or negligence on the part

12  of the defendant.  *See Boswell,* 730 P.2d at 180 n. 1; Restatement §§ 580A, 580B. The

13  plaintiff bears the burden of proving fault. *Id.* § 580B cmt. j; *see also id.* § 580A cmt. e.

14      When discussing qualified privilege, the Court found that Plaintiff failed to show

15  actual malice.  The remaining question is therefore whether Plaintiff can establish that

16  Defendant acted negligently by failing to act "reasonably in attempting to discover the truth

17  or falsity or the defamatory character of the publication." *Best Western Int'l*, 2008 WL

18  4182827, at *9 (citation altered).

19      Plaintiff contends, albeit not consistently, that Defendant published the Company

20  Texts without conducting any investigation into the word of Ms. Rodriguez, a "known

21  troublemaker" who "had a clear hatred of Plaintiff."  (Doc. 89 at 11; *see also* Doc. 81 at 10;

22  *but see* Doc. 90 (Plaintiff's Controverting Statement of Facts ("PCSOF")) ¶ 16 ("Mr.

23  Lampton did leave the building . . . [Ms.] Paige showed him where the vehicle that

24  resembled Plaintiff's had been driven.").)   Putting Plaintiff's contradictory statements

25  aside, even if Mr. Lampton did not investigate, any failure under the circumstances was

26  reasonable.  Plaintiff has not shown that Mr. Lampton, who had no reason to distrust Ms.

27  Paige and knew of Plaintiff's violent threats against Ms. Rodriguez, acted unreasonably by

28  perhaps not leaving the building to potentially come face-to-face with a person who stated

that he would "not kill but beat [Ms. Rodriguez] enough to hurt her to be disabled." (Doc. 88-8 at 2; Lampton Depo. at 13, 30, 32; *see also* Plaintiff Depo at 209–10 (testifying that he has no reason to believe that Mr. Lampton doubted Ms. Pagie's statements about Plaintiff's presence).) Put another way, no prudent person under similar circumstances would jeopardize their life to determine if a former employee who compared himself to mass killers and threatened his coworker was approaching the premises. *See Peagler v. Phoenix Newspapers, Inc.*, 560 P.2d 1216, 1222 (Ariz. 1977) (explaining that negligence in defamation "is the failure to use that amount of care which a reasonably prudent person would use under like circumstances"). Therefore, no reasonable jury could find that Defendant acted negligently to determine the truth of its statement, meaning here that no jury could find Defendant at fault. Because fault is necessary, Plaintiff's failure to adduce sufficient evidence to show it at this stage is fatal. *Celotex Corp.*, 477 U.S. at 322.

### c.  Harm

Even if Plaintiff could show fault, he has failed to produce sufficient evidence of harm to survive summary judgment. In defamation actions, the Plaintiff must show that he has "either presumed or actual damages." *Best Western Int'l*, 2008 WL 4182827, at *4.

Plaintiff claims the Company Texts defamed him such that he lost $300,000 and has suffered, among other things, high blood sugar. (*See* Plaintiff Depo. at 231, 268.) Here, Plaintiff has the burden to show that the alleged harms—i.e., emotional damages and loss of earning capacity—were resultant from the reputational damage the texts caused to him. (*See, e.g.*, Doc. 89 ("Plaintiff's reputation was damaged from the company's statements to employees."); Doc. 81 at 6 (same).) Indispensable, then, is Plaintiff's responsibility to show that the statement damaged his reputation in the first instance. There is scant evidence on the record to establish any such damage. Indeed, Plaintiff readily admitted he obtained new employment a week after Defendant terminated him. (*See* Doc. 85 (Defendant's Statement of Facts ("DSOF")) ¶ 32; Doc. 90 (PCSOF ¶ 32.) He also admitted that the alleged defamation did not prevent him from obtaining his new employment or receiving a pay raise. (DSOF ¶ 32.) Plaintiff's new employer remains unaware of the

alleged defamation.  (*Id.*)  Plaintiff admitted that no person outside of Defendant's company is aware of the Company Texts, except those persons he may have shown.  (*Id.*)  But there is no evidence on the record that anyone outside of Defendant's company believes the Company Texts harmed Plaintiff's reputation.  (*See* Plaintiff Depo. at 248–249 ("Q: Just so I understand, you can't identity anyone outside of MVT who can testify about damage to your reputation? A: I cannot.").)

Plaintiff also testified that he has not been denied membership in any community groups or places of worship, nor been denied licensing based on the Company Texts. (Plaintiff Depo. at 271–72.)  Similarly, Plaintiff has not sought the care of a mental health professional, and thus he cannot apportion the emotional distress caused by this lawsuit compared to his other, ongoing suits.  (*Id.* at 276–79.)

The lack of record evidence regarding Plaintiff's diminished reputation outside of Defendant's business is troubling.  Without such evidence, Plaintiff cannot hope to prove his emotional damage or lost earning capacity.  And while former coworkers have testified that they believed the statement could have damaged Plaintiff's reputation, those witnesses did not affirmatively testify that they held Plaintiff in disrepute or otherwise connect his alleged damages to the Company Texts.  (*See, e.g.*, Doc. 90 at 109 (Ms. Hawkins testifying about her belief that the Company Texts may have harmed Plaintiff's reputation); *id.* at 66 (James Render testifying the same); *id.* at 113 (Hickely Abreue testifying the same).)[4]

At bottom, there is no evidence that any reputational damage to Plaintiff based on the Company Texts has resulted in lost earning capacity.[5]  Therefore, no reasonable jury

---

[4] Even if Plaintiff could show a modicum of reputational harm, he would also need to show that Company Texts harmed his reputation any more than his own actions in threatening Ms. Rodriguez, which others in the company had obviously heard about through gossip. *Cf. Fender v. Phoenix Newspapers Inc.*, 636 P.2d 1257, 1262 n.4 (Ariz. Ct. App. 1981) (noting in an action brought by a convict against a publisher of a story based upon the court's transcript of the proceedings that the publisher arguably embellished that the statements "did not cause (plaintiff's) 'good name' to be sullied any more than it already had been by the fact of his murder conviction").

[5] In his response to Defendant's interrogatories, Plaintiff contends that "he has no documents to support his damage to his reputation and under Arizona, law, defamation per se does not require proof of actual damages." (Doc. 88-3 at 11.)  A statement is defamation *per se* when its publication, among other things, "tends to injure a person in his profession, trade or business."  *Modla v. Parker*, 495 P.2d 494, 496 n.1 (Ariz. Ct. App. 1972).  To fit within the "business category," the statement must "prejudice the person in the profession,

1    could find that the Company Texts caused Plaintiff's damages.

2                    3.   <u>Punitive Damages</u>

3           "[T]o obtain punitive damages, plaintiff must prove that defendant's evil hand was

4    guided by an evil mind. The evil mind which will justify the imposition of punitive

5    damages may be manifested in either of two ways. It may be found where defendant

6    intended to injure the plaintiff. It may also be found where, although not intending to cause

7    injury, defendant consciously pursued a course of conduct knowing that it created a

8    substantial risk of significant harm to others." *Burton v. United Servs. Auto. Ass'n*, No.

9    CV-22-00837-PHX-DWL, 2023 WL 5507829, at *9 (D. Ariz. Aug. 25, 2023) (quoting

10   *Farr v. Transamerica Occidental Life Ins. Co. of Cal*., 699 P.2d 376, 384 (Ariz. Ct. App.

11   1984)).

12          If a party fails to sustain a claim for an underlying tort, a claim for punitive damages

13   will not stand. *Burton*, 2023 WL 5507829, at *9 ("Under Arizona law, [t]here is no such

14   thing as a cause of action simply for punitive damages.  Rather, the right to an award of

15   punitive damages must be grounded upon a cause of action for actual damages." (internal

16   quotation marks omitted)).   Because the Court enters summary judgment in favor of

17   Defendant's, Plaintiff claim to punitive damages claim must fail.  Therefore, the Court will

18   grant summary judgment against Plaintiff's claim for punitive damages.

19   **IV.    CONCLUSION**

20          Accordingly,

21          **IT IS HEREBY ORDERED granting** Defendant's Motion for Summary

22   Judgment.  (Doc. 84).

23          **IT IS FURTHER ORDERED denying** Plaintiff's Motion for Summary Judgment

24   (Doc. 81).

25          …

26          …

27   _____

28   trade or business in which he is actually engaged . . . . Words which are merely injurious
     to one regardless of his occupation do not qualify." *Id.* at 496–97.  The statement at issue
     here is does not concern Plaintiff's ability to perform his job duties.

**IT IS FURTHER ORDERED** vacating all future court dates and directing the Clerk of Court to enter judgment consistent with this Order and terminate this case.

Dated this 7th day of August, 2025.

Honorable Susan M. Brnovich
United States District Judge